# UNITED STATES DISTRICT COURT
## District of Kansas
(Kansas City Docket)

UNITED STATES OF AMERICA,

      **Plaintiff,**

    **v.**               **CASE NO. 2:23-CR-20010-DDC**

**DOUGLAS EDWARD ROBERTSON**

         **and**

**OLEG CHISTYAKOV**
    **a.k.a. OLEGS ČISTJAKOVS,**

      **Defendants.**

# SECOND SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES**:

At all times material to this Second Superseding Indictment:

## BACKGROUND

1.     Since at least October 2020 up to and including March 2023, DOUGLAS

EDWARD ROBERTSON, OLEG CHISTYAKOV, a.k.a. OLEGS ČISTJAKOVS,

defendants, and Cyril Gregory Buyanovsky conspired to circumvent U.S. export laws and

regulations in order to sell, repair, and ship from the United States sophisticated avionics equipment to customers around the world that operate Russian-built aircraft.  Avionics are the electronics installed in aircraft and can include communications, navigation, flight control, and threat detection systems.

2.  In the course of exporting avionics equipment from the United States through their company, KanRus Trading Company Inc. ("KanRus"), which is located in the District of Kansas, Buyanovsky and defendant ROBERTSON repeatedly concealed and misstated the true end users, value, and end destinations of their exports by creating false invoices, submitting false information on export documents, and failing to file required export documents.

3.  Often working with intermediaries, such as defendant CHISTYAKOV, Buyanovsky and ROBERTSON transshipped items through third-party countries, such as Germany, the United Arab Emirates ("UAE"), Cyprus, and Armenia; exported items to intermediary companies that then reexported the items to the ultimate end destinations; and made or received payments from bank accounts located in foreign countries, including the UAE, Kazakhstan, Kyrgyzstan, Cyprus, Russia, and Armenia.

4.  After the Russian Federation's unprovoked invasion of Ukraine on February 24, 2022, and the imposition of additional restrictions on the export of avionics from the United States to Russia, Buyanovsky, ROBERTSON, and CHISTYAKOV continued to export avionics to Russia despite knowing that such exports required a license from the U.S. Department of Commerce, which they neither sought nor obtained.

2

Individuals and Companies

5.      Buyanovsky was the president and owner of KanRus.  Buyanovsky was a U.S. citizen who resided in Douglas County, Kansas.  He previously worked at an avionics manufacturer as an engineer.

6.      The defendant DOUGLAS EDWARD ROBERTSON was the vice president of KanRus.  Robertson was a U.S. citizen who resided in Johnson County, Kansas.  ROBERTSON was a commercial pilot.

7.      The defendant OLEG CHISTYAKOV, a.k.a. OLEGS ČISTJAKOVS, was an intermediary who negotiated and processed orders from RosAero JSC (i.e., Russian Company-3) and Russian Company-4 for KanRus, Buyanovsky, and ROBERTSON as part of the conspiracy.  CHISTYAKOV was a citizen of Latvia and resided there, but he frequently traveled to the UAE.

8.      KanRus was registered in the District of Kansas and supplied Western avionics equipment, including U.S.-origin equipment, and repair services for Russian-manufactured aircraft.

9.      "Russian Company-1" was located in Moscow, Russia and was a Russian aircraft parts distributor.  "Individual-1," whose identity is known to the Grand Jury, was a Russian national and the chief executive officer of Russian Company-1.

10.      "Russian Company-2" was located in Krasnodar, Russia and provided aerial services using its fleet of helicopters.  "Individual-2," whose identity is known to the Grand Jury, was an engineer working for Russian Company-2.

3

11. RosAero JSC (i.e., Russian Company-3) was located in Moscow, Russia and was a Russian aircraft maintenance, repair, and overhaul company.  CHISTYAKOV (i.e., Individual-3) negotiated and processed orders from RosAero for KanRus, Buyanovsky, and ROBERTSON, and used RosAero's bank account in the UAE to pay KanRus.

12. "Russian Company-4" was located in Moscow, Russia and was a Russian aircraft parts distributor.  CHISTYAKOV also negotiated and processed orders from Russian Company-4 for KanRus, Buyanovsky, and ROBERTSON.

13. "UAE Company-1" was located in Ajman, UAE and was a trading company that sent KanRus funds on behalf of RosAero.

14. "Kazakh Company-1" was located in Almaty, Kazakhstan and was a logistics company that sent KanRus funds on behalf of Russian Company-4.

15. "Kyrgyz Company-1" was located in Bishkek, Kyrgyzstan and sent KanRus funds on behalf of Russian Company-4.

16. "UAE Company-2" was located in Sharjah, UAE and was an aircraft parts supplier that Russian Company-4 used to receive avionics equipment from KanRus in the United States.

17. "German Company-1" was located in Schöneck, Germany and was a logistics company that RosAero used to send and receive avionics equipment to and from KanRus in the United States.

18.     "Armenian Company-1" was located in Yerevan, Armenia and was a company that Russian Company-1 used to pay for and transship avionics equipment to Russia.

19.     "Individual-4," whose identity is known to the Grand Jury, was a Russian national who brokered orders from Russian customers for KanRus.

20.     "Laotian Company-1" was located in Vientiane, Laos and was a company that Russian Company-4 used to receive avionics equipment exported from the United States.

<u>The Statutory and Regulatory Background</u>

**The Export Control Reform Act and Export Administration Regulations**

21.     The Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Sections 730-774, were promulgated by the United States Department of Commerce, Bureau of Industry and Security ("BIS") to regulate the export of goods, technology, and software from the United States.  Under the Export Control Reform Act ("ECRA"), it was a crime to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR, according to Title 50, United States Code, Section 4819(b).  Willful violations of the EAR constituted criminal offenses under the ECRA, as provided in Title 50, United States Code, Section 4819(b).

22.     Through the EAR, BIS reviewed and controlled the export of certain items from the United States to foreign countries in accord with Title 15, Code of Federal Regulations, Sections 734.2-3.  In particular, BIS placed restrictions on the export and

reexport of items that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

23.     The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by an Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use, and end user of the item.

24.     On February 24, 2022, in response to the Russian Federation's unprovoked invasion of Ukraine, the U.S. Department of Commerce imposed new license requirements on exports and reexports to Russia.  As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia.  *See* Volume 87, Federal Register, Page 12226 (published Mar. 3, 2022).

### The Commerce Control List Items

25.     A Traffic Alert and Collision Avoidance System ("TCAS"), or airborne collision avoidance system, is a family of airborne devices that function independently of the ground-based air traffic control system and provide collision avoidance protection for a broad spectrum of aircraft types.  A TCAS is composed of many components, including a computer processor unit, transponders, control and display panels, and antennas.

26.     During the relevant period, certain components of a TCAS were on the CCL and classified by BIS under ECCN 7A994 (other navigation direction finding equipment, airborne communication equipment, all aircraft inertial navigation systems not controlled under 7A003 or 7A103, and other avionic equipment, including "parts" and "components").

27.     During the relevant time period, the following avionics were on the CCL and classified by BIS under ECCN 7A994 (navigation/communication systems): Honeywell BendixKing KI-203 installation kit, Honeywell BendixKing KT-74 transponder, Honeywell BendixKing KA-61 L-Band antenna, Honeywell BendixKing KN-62A distance-measuring equipment unit and installation kit, and Honeywell BendixKing KT-76C transponder and installation kit.  During the relevant time period, the VIAVI IFR-6000 transponder test kit was on the CCL and classified by BIS under ECCN 7B994 (other equipment for the test, inspection, or production of navigation and avionics equipment).  As of February 24, 2022, an export license was required from the Department of Commerce to export these avionics to Russia.

## Export and Shipping Records

28.     Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States.  Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

29.     The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States.  Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more.  An EEI also is required regardless of the value of the goods if the goods require an export license.  Title 15, Code of Federal Regulations, Sections 758.1, 30.2

30.     A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export.  The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

31.     As of June 29, 2020, all exports to Russia of items on the CCL, regardless of value, required an EEI filing.  Title 15, Code of Federal Regulations, Section 758.1(b)(10).

32.     The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the EEI and AES aid in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments before exportation.  Title 15, Code of Federal Regulations, Section 30.1(b).

# COUNT 1

**CONSPIRACY TO COMMIT OFFENSES AGAINST THE UNITED STATES**
**[18 U.S.C. § 371]**

33. Paragraphs 1 to 32 of the introductory allegations are restated and realleged as if set forth herein.

34. Between at least in or about 2020 and continuing through in or about March 2023, the exact dates being unknown to the Grand Jury, in the District of Kansas and elsewhere, the defendants,

**DOUGLAS EDWARD ROBERTSON,**
**and**
**OLEG CHISTYAKOV,**
**a.k.a. OLEGS ČISTJAKOVS,**

did knowingly and willfully combine, conspire, confederate, and agree with each other, Cyril Buyanovsky, and with others known and unknown to the Grand Jury, including individuals associated with Russian Company-1, Russian Company-2, RosAero, and Russian Company-4, to commit offenses against the United States, that is:

    a. to willfully export and cause the exportation of goods from the United States to Russia without first having obtained the required licenses from the Department of Commerce in violation of Title 50, United States Code, Section 4819(a), and Title 15, Code of Federal Regulations, Section 764.2;

    b. to knowingly fail to file and submit false and misleading export information through the EEI and the AES, and cause the same, in violation of Title 13, United States Code, Section 305, and Title 15, Code of Federal Regulations, Section 30.71; and

9

c.      to fraudulently and knowingly export and send and attempt to export and send from the United States merchandise, articles, and objects contrary to laws and regulations of the United States, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to laws and regulations of the United States, in violation of Title 18, United States Code, Section 554.

## Objects of the Conspiracy

35.     The objects of the conspiracy were:

a.      to acquire avionics equipment that was manufactured and sold in the United States on behalf of entities that operated Russian-built aircraft in Russia and other countries;

b.      to repair and recertify in the United States avionics equipment that was used in Russian-built aircraft located and operated outside of the United States;

c.      to export avionics equipment from the United States directly and indirectly, to Russia and Russian end users located in other countries;

d.      to conceal the prohibited activities and transactions from detection by the U.S. Government so as to avoid penalties and disruption of the illegal activities;

e.      to profit through these illegal activities; and

f.      to evade the prohibitions and licensing requirements of the ECRA and EAR.

**Manner and Means of the Conspiracy**

36.     Defendants ROBERTSON and CHISTYAKOV and other co-conspirators, known and unknown to the Grand Jury, used the following manner and means, among others, to accomplish the objects of the conspiracy:

a.      ROBERTSON, CHISTYAKOV, and other co-conspirators, including individuals associated with Russian Company-1, Russian Company-2, RosAero, and Russian Company-4, used email and other means to communicate;

b.      CHISTYAKOV and individuals associated with Russian Company-1, Russian Company-2, RosAero, and Russian Company-4 solicited quotes from and negotiated with Buyanovsky and ROBERTSON for the purchase and repair of U.S. avionics equipment for Russian customers and customers that operated Russian-built aircraft;

c.      Buyanovsky and ROBERTSON purchased items from companies in the United States to fulfill orders from Russian customers, including by providing false information to the U.S. companies;

d.      Buyanovsky and ROBERTSON imported U.S.-origin avionics equipment from an overseas dealer to be repackaged and reexported outside of the United States to a Russian customer;

e.      Buyanovsky and ROBERTSON used coded language in their email communications to conceal their illegal conduct;

11

f.      Buyanovsky, ROBERTSON, and other co-conspirators used methods of electronic communication that they believed to be secure and inaccessible to the U.S. Government, such as handwriting and password protecting documents, using an encrypted messaging application, and using an encrypted email service;

g.      Buyanovsky, ROBERTSON, CHISTYAKOV, and other co-conspirators, including individuals associated with Russian Company-1, Russian Company-2, RosAero, and Russian Company-4, arranged for shipment of the U.S. goods from the United States to transshipment points in foreign countries, including Germany, the UAE, Cyprus, and Armenia to conceal the true end users and end destinations;

h.      Buyanovsky and ROBERTSON falsified export and shipping records regarding shipments from the United States, including by providing false and misleading information to the shippers and freight forwarders, to conceal the true value of the goods, the ultimate destination of the goods, and the ultimate end user of the goods;

i.      CHISTYAKOV and individuals associated with Russian Company-1, Russian Company-2, RosAero, and Russian Company-4 transferred funds for the purchase and shipment of the goods through bank accounts in foreign countries, including the UAE, Russia, Kazakhstan, Kyrgyzstan, Cyprus, and Armenia to KanRus's bank account in the United States; and

j.     Buyanovsky, ROBERTSON, CHISTYAKOV, and other co-conspirators, including individuals associated with Russian Company-1, RosAero, and Russian Company-4, caused the U.S. goods to be exported from the United States to individuals and entities in Russia without obtaining the required licenses from the Department of Commerce.

**Overt Acts in Furtherance of the Conspiracy**

37.     In furtherance of the conspiracy and to achieve the objects thereof, Buyanovsky, defendant ROBERTSON, defendant CHISTYAKOV, and others committed and caused to be committed the following overt acts, among others, in the District of Kansas and elsewhere:

*February 4, 2021 Export to Russian Company-2 in South Sudan*

38.     On or about October 14, 2020, Individual-2, an engineer at the helicopter company Russian Company-2, sought a quote to repair a computer component of a TCAS that was located in South Sudan.  After Buyanovsky advised that the component could not be imported from or exported to South Sudan, Buyanovsky and Individual-2 agreed to ship the component from and return it to the UAE.

39.     On or about November 11, 2020, Individual-2 emailed a draft invoice to Buyanovsky, which Buyanovsky then forwarded to ROBERTSON and asked him to look at before the component was shipped.  The invoice listed the customer as a UAE company, did not mention Russian Company-2 or South Sudan, and falsely listed the value of the component as $100.

40.     On or about November 11, 2020, Buyanovsky emailed the aforementioned invoice back to Individual-2, along with a separate stamped invoice that listed the true value of the transaction as $10,950.  Individual-2 responded and asked whether the value of the component could be undervalued on the shipping invoice (*i.e.*, the invoice that would accompany the component when it was shipped) to lower the customs fees at the destination.  Buyanovsky agreed to lower the value on the shipping invoice.

41.     On or about November 25, 2020, Russian Company-2 made a payment from a Cypriot bank account to KanRus's bank account for this export.

42.     On or about December 5, 2020, Russian Company-2 shipped the TCAS computer component from the UAE to KanRus in the District of Kansas.  The reported U.S. customs value on the shipment was $100.

43.     Upon receipt of the TCAS computer component, Buyanovsky emailed a U.S. company to request pricing for the repair.  During those communications, the U.S. company requested that Buyanovsky complete an end-use and end-user statement. Buyanovsky forwarded the request to Individual-2, who completed and returned the statement.  Buyanovsky then forwarded the end-use and end-user statement to the U.S. company.  The statement claimed, among other things, that Russian Company-2 was the end user and that the component would be delivered to Russia.  The statement failed to mention South Sudan.

44.     On or about February 4, 2021, Buyanovsky and ROBERTSON exported the repaired TCAS computer component to the address of another UAE company that Individual-2 had provided to Buyanovsky.

14

45.     On or about February 4, 2021, Buyanovsky caused the shipper to fail to file an EEI in connection with this export.

*February 26, 2021 FSB Export to RosAero in Russia*

46.     On or about November 11, 2020, CHISTYAKOV on behalf of RosAero emailed ROBERTSON a list of avionics equipment for KanRus to repair in the United States, along with a shipping label that showed the equipment being shipped from German Company-1 to KanRus.  CHISTYAKOV also sent ROBERTSON a proforma customs invoice that valued the equipment at $380 and listed the shipper as a UAE company that had the same name as RosAero.

47.     On or about November 20, 2020, ROBERTSON emailed CHISTYAKOV and described the specific pieces of avionics equipment that he had received from CHISTYAKOV.  One of the pieces of equipment was a TCAS computer processor called a TPU.  Regarding the TPU, ROBERTSON wrote, "TPU has a ФСБ [*i.e.*, FSB] sticker on it!!!"  In response, CHISTYAKOV wrote, "Interesting about sticker, you can remove and after stick on back?"  FSB is the acronym for the Federal Security Service of the Russian Federation, which is the principal intelligence and security agency of the Russian Government.

48.     On or about January 27, 2021, ROBERTSON emailed CHISTYAKOV an invoice for the repairs with a total value of $28,769.  The invoice listed German Company-1 as the recipient company and UAE Company-1 as the payor company.

49.     On or about February 9, 2021, UAE Company-1 made a payment to KanRus's U.S. bank account for this export.

50.     The next day, on or about February 10, 2021, CHISTYAKOV emailed ROBERTSON a proposed "shipping" invoice that undervalued the repaired goods at $3,645.

51.     On or about February 25, 2021, ROBERTSON asked CHISTYAKOV, "can I change value to less than $2500? Less paperwork for me."

52.     On or about February 26, 2021, ROBERTSON exported some of the repaired avionics equipment to German Company-1, specifically the TPU processor and a radar sensor.

53.     On or about February 26, 2021, ROBERTSON sent CHISTYAKOV a copy of the shipping label and invoice that undervalued the equipment at $2,275.

54.     On or about February 26, 2021, ROBERTSON caused the shipper to fail to file an EEI in connection with this export.

*April 1, 2021 Export to RosAero via Germany*

55.     On or about January 20, 2021, CHISTYAKOV emailed ROBERTSON to ask for a quote for an order of multiple avionics components, including a TPU processor, antennas, and transponders.  ROBERTSON provided a quote and asked, "When is RosAero wanting to pay?"

56.     On or about January 27, 2021, ROBERTSON emailed CHISTYAKOV a stamped invoice for the shipment valuing the goods at $159,625.  As with the February 26, 2021 export, UAE Company-1 was listed as the payor company and German Company-1 was listed as the recipient company.

16

57.     On or about February 8, 2021, UAE Company-1 sent $159,625 to KanRus's U.S. bank account.  Later that day, Buyanovsky emailed ROBERTSON and told him that the order was "fully funded to the tune of 159625 this morning."

58.     On or about February 9, 2021, ROBERTSON and Buyanovsky proceeded to purchase the avionics equipment from U.S. companies.

59.     On or about March 29, 2021, ROBERTSON emailed a freight forwarder an invoice for this shipment that listed the value of the goods as $6,118 and the recipient as Germany Company-1.  ROBERTSON also attached a Shipper's Letter of Instructions that identified German Company-1 as the ultimate consignee and incorrectly listed the ECCN for the components as EAR99.

60.     On or about March 30, 2021, ROBERTSON caused the shipper to file a false and misleading EEI that listed the value of the export as $6,118 and the ultimate consignee as Germany Company-1 when, in fact, the avionics shipment was valued at $159,625 and was destined for RosAero.

61.     On or about April 1, 2021, ROBERTSON caused the avionics equipment to be exported.

*February 28, 2022 Attempted Export to Russian Company-1 and Detention*

62.     On or about February 7, 2022, Individual-1 placed an order with Buyanovsky to order Honeywell BendixKing KT-74 transponders from a U.S. company and ship them to Russia.  Individual-1 also told Buyanovsky that after Buyanovsky received the transponders from the U.S. supplier and received payment from Individual-1, the transponders needed to be sent to Individual-1 in Russia.

17

63. On or about February 10, 2022, Russian Company-1 made a payment from a Russian bank account to KanRus's bank account for four KT-74 transponders.

64. On or about February 18, 2022, Russian Company-1 made a payment from a Russian bank account to KanRus's bank account for four more KT-74 transponders.

65. On or about February 28, 2022, ROBERTSON attempted to export the eight KT-74 transponders to Russian Company-1 in Russia, but the shipment was detained by the U.S. Government, after which BIS directly informed ROBERTSON that a license was required to export the KT-74 transponders to Russia.

66. In or about March 2022, Buyanovsky and Individual-1 began using an encrypted messaging platform to communicate.

67. Between on or about April 14, 2022 and April 19, 2022, Individual-1 and Buyanovsky exchanged encrypted messages about using a company in Armenia as the transshipment point for shipments destined for Russia.  Specifically, on or about April 19, 2022, Buyanovsky sent an encrypted message to Individual-1 emphasizing that it was important for the transshipment company to have ties to aviation and not to be a logistics company.

*April 29, 2022 Export to Laotian Company-1 for Russian Company-4*

68. On or about January 27, 2022, CHISTYAKOV sent ROBERTSON an invoice to purchase two Honeywell BendixKing KT-74 transponders, two Honeywell BendixKing KN-53 navigation receivers, and two Honeywell BendixKing KN-53 installation kits and export them to Russian Company-4 in Russia for $27,806.

69.     On or about January 31, 2022, Russian Company-4 made a payment from its Russian bank account to KanRus's U.S. bank account for this export.

70.     On or about March 8, 2022, after Russia's invasion of Ukraine, the U.S. Government's imposition of additional restrictions on exports and reexports to Russia, and the U.S. Government's detention of KanRus's attempted export to Russian Company-1, ROBERTSON emailed Buyanovsky.  ROBERTSON attached a proposed letter to send to CHISTYAKOV, which described the current options for shipping as either shipping within the U.S. or shipping to a company in a neutral country that was not a logistics company and did not have ties to Russia.

71.     On or about March 8, 2022, ROBERTSON emailed the "shipping options" letter to CHISTYAKOV.

72.     After on or about March 8, 2022, ROBERTSON and CHISTYAKOV exchanged emails discussing possible shipping options, including whether specific companies in the UAE or Laos, including Laotian Company-1, would be acceptable recipients.

73.     On or about March 30, 2022, CHISTYAKOV sent ROBERTSON an email that stated that Russian Company-4 wanted to ship the avionics equipment directly to Laotian Company-1.

74.     On or about April 27, 2022, ROBERTSON exchanged emails with CHISTYAKOV in which he stated, among other things, that "things are complicated in USA," and that the invoice amount needed to be less than $50,000 because, otherwise,

19

there would be "more paperwork and visibility" and "This is NOT the right time for either."

75.     On or about April 29, 2022, ROBERTSON caused the avionics equipment to be exported to Laotian Company-1.

*May 20, 2022 Export to Russian Company-1 via Cyprus*

76.     On or about April 26, 2022, Individual-1, who was the chief executive officer of Russian Company-1, booked a flight from Russia to Cyprus scheduled to depart on or about May 14, 2022.

77.     On or about May 16, 2022, Buyanovsky ordered seven Honeywell BendixKing KI-203 installation kits for Individual-1.  These kits were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

78.     On or about May 17, 2022, Individual-1 sent Buyanovsky Individual-1's residential address in Cyprus.

79.     On or about May 20, 2022, Individual-1 made a payment from a Cypriot bank account to KanRus's bank account for this export.

80.     On or about May 20, 2022, ROBERTSON caused the seven installation kits to be exported to Individual-1 at a residential address in Cyprus.

81.     On or about May 20, 2022, Buyanovsky caused the shipper to fail to file an EEI in connection with this export.

82.     On or about May 20, 2022, Buyanovsky emailed the invoice and shipping label for this export to Individual-1.

20

83.     On or about May 26, 2022, Individual-1 received the package of seven KI-203 installation kits in Cyprus.

84.     On or about May 28, 2022, Individual-1 flew back to Russia from Cyprus.

85.     At no time did either ROBERTSON or Buyanovsky obtain the required license from the Commerce Department to export or reexport the KI-203 installation kits to Russia.

*June 16, 2022 Export to Russian Company-1 via Armenia*

86.     On or about June 9, 2022, Armenian Company-1 emailed Buyanovsky and asked for an offer for eight KT-74 transponders to be exported to Yerevan, Armenia.  The eight transponders were the same make and model of the eight transponders that ROBERTSON and Buyanovsky had attempted to export to Individual-1 of Russian Company-1 in February 2022 as described in paragraphs 62 to 67.  Buyanovsky then forwarded the proposed invoice for the shipment to ROBERTSON and wrote that, "The V [*i.e.*, the first initial of Individual-1's last name] connection requested an invoice and for some reason they wanted the transportation cost to Yerevan. . . . Is export department ok with this?"

87.     On or about June 16, 2022, ROBERTSON caused the eight KT-74 transponders to be exported to Armenian Company-1.  The KT-74 transponders were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

88.     On or about June 16, 2022, ROBERTSON caused the shipper to fail to file an EEI for this export.

89.     On or about June 28, 2022, Armenian Company-1 reexported the KT-74 transponders from Armenia to Russia.

90.     At no time did either ROBERTSON or Buyanovsky obtain the required license from the Commerce Department to export or reexport the KT-74 transponders to Russia.

*July 18, 2022 Export to Russian Company-1 via Armenia*

91.     On or about July 11, 2022, ROBERTSON and BUYANOVSKY emailed each other about another export to Armenian Company-1.  The subject line of the email exchange was, "V"—the first initial of Individual-1's last name.  BUYANOVSKY told ROBERTSON that a "somewhat more proper sequence of events can now proceed" and that "V will pay once they get the invoice."

92.     Also on or about July 11, 2022, Armenian Company-1 made a payment from an Armenian bank account to KanRus's bank account for eight Honeywell BendixKing KA-61 L-Band antennas.

93.     On or about July 18, 2022, ROBERTSON emailed the shipping documents for this export to Buyanovsky and caused the export of the eight KA-61 antennas to Armenian Company-1.  The KA-61 antennas were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

94.     On or about July 18, 2022, ROBERTSON caused the shipper to fail to file an EEI for this export.

95. On or about July 27, 2022, Armenian Company-1 reexported the eight KA-61 antennas to Russia.

96. At no time did either ROBERTSON or Buyanovsky obtain the required license from the Commerce Department to export or reexport the KA-61 antennas to Russia.

*October 11, 2022 Export to Russian Company-4 via the UAE*

97. On or about August 19, 2022, CHISTYAKOV emailed ROBERTSON a draft invoice for an order of two BendixKing KN-62A distance-measuring equipment unit installation kits and two BendixKing KT-76C transponders and installation kits. The invoice listed Kazakh Company-1 as the payor and Laotian Company-1 as the recipient. CHISTYAKOV also attached to the email a ledger titled, "Oleg-August-2022-[Russian Company-4]," which reflected Russian Company-4's outstanding orders with KanRus and the portion of funds due to CHISTYAKOV. Later that day, ROBERTSON emailed CHISTYAKOV back a copy of the invoice containing KanRus's official corporate stamp.

98. On or about August 23, 2022, CHISTYAKOV emailed ROBERTSON and told him that Russian Company-4 was sending the payment for this shipment through a company in Kazakhstan.

99. On or about September 2, 2022, Kazakh Company-1 made a payment from a Kazakh bank account to KanRus's bank account for this export.

100. On or about September 5, 2022, CHISTYAKOV forwarded ROBERTSON an email chain from individuals associated with Russian Company-4 and Kazakh

23

Company-1 concerning the September 2, 2022 payment from the Kazakh bank account to KanRus's bank account and asked ROBERTSON to confirm receipt of the wire.

101.   On or about September 7, 2022, ROBERTSON and Buyanovsky ordered the avionics equipment for this export from U.S. companies.

102.   On or about September 14, 2022, ROBERTSON emailed CHISTYAKOV to say that the shipment would be ready soon and to confirm the shipping details. ROBERTSON also asked, "Why not ship to KZ."

103.   On or about September 28, 2022, CHISTYAKOV forwarded ROBERTSON an email chain between CHISTYAKOV and individuals associated with Kazakh Company-1 and Russian Company-4.  In one of the emails, an individual whose title was head of sales for Russian Company-4 told CHISTYAKOV that the shipment would most likely need to be sent to a company in the UAE instead of Laotian Company-1.

104.   On or about October 3, 2022, ROBERTSON emailed CHISTYAKOV the invoice with instructions to update the recipient to the UAE company.

105.   On or about October 7, 2022, CHISTYAKOV emailed ROBERTSON an updated invoice with a "correction from [Russian Company-4]."  The corrected invoice listed a different company, UAE Company-2, as the recipient.

106.   On or about October 11, 2022, ROBERTSON caused the shipper to file a false and misleading EEI that listed the ultimate consignee as UAE Company-2 and the ultimate destination as the UAE when, in fact, the avionics shipment was destined for Russian Company-4 in Russia.

24

107. On or about October 11, 2022, ROBERTSON caused the two KN-62A distance-measuring equipment unit installation kits and two KT-76C transponders and installation kits to be exported to UAE Company-2. The KN-62A distance-measuring equipment unit installation kit, the KT-76C transponder, and the KT-76C installation kit were on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

108. On or about October 12, 2022, ROBERTSON emailed the invoice and shipping label for this export to CHISTYAKOV.

109. At no time did either ROBERTSON, CHISTYAKOV, or Buyanovsky obtain the required license from the Commerce Department to export or reexport the KN-62A distance-measuring equipment unit installation kits, KT-76C transponders, or KT-76C installation kits to Russia.

*December 14, 2022 Export to Russian Company-4 via the UAE*

110. On or about October 25, 2022, CHISTYAKOV emailed ROBERTSON asking to order another KN-62A distance-measuring equipment unit for Russian Company-4.

111. On or about October 31, 2022, CHISTYAKOV emailed ROBERTSON a draft invoice listing Kazakh Company-1 as the payor and UAE Company-2 as the recipient. Later that day, ROBERTSON emailed CHISTYAKOV a stamped version of the invoice.

112. On or about November 11, 2022, CHISTYAKOV forwarded ROBERTSON an email conversation between CHISTYAKOV and individuals

associated with Kazakh Company-1 and Russian Company-4 in which they requested that the payor party on the invoice be switched from Kazakh Company-1 to Kyrgyz Company-1.  Later that day, ROBERTSON emailed CHISTYAKOV a revised invoice.

113.    On or about November 15, 2022, CHISTYAKOV forwarded ROBERTSON an email chain from individuals associated with Kazakh Company-1 and Russian Company-4 stating that the payment had been sent.

114.    On or about November 16, 2022, Kyrgyz Company-1 made a payment from a Kyrgyz bank account to KanRus's bank account for this export.

115.    On or about November 16, 2022, ROBERTSON ordered the avionics equipment for this export from a U.S. company.

116.    On or about December 14, 2022, ROBERTSON caused the shipper to file a false and misleading EEI that listed the ultimate consignee as UAE Company-2 and the ultimate destination as the UAE when, in fact, the avionics shipment was destined for Russian Company-4 in Russia.

117.    On or about December 14, 2022, ROBERTSON caused the KN-62A distance-measuring equipment unit to be exported to UAE Company-2 for reexport to Russia.  The KN-62A distance-measuring equipment unit was on the CCL, classified by BIS under ECCN 7A994, and required a license from the Commerce Department to be exported or reexported to Russia.

118.    On or about December 14, 2022, ROBERTSON emailed the shipment's tracking number for this export to CHISTYAKOV.

119.    At no time did either ROBERTSON, CHISTYAKOV, or Buyanovsky obtain the required license from the Commerce Department to export or reexport the KN-62A distance-measuring equipment unit to Russia.

*March 2023 Attempted Reexport of U.S.-origin Avionics from Czech Dealer*

120.    On or about October 28, 2022, ROBERTSON emailed a document to Individual-4 stating that a U.S. manufacturer of avionics equipment had cancelled KanRus's status as a dealer.  Later that day, Individual-4 asked ROBERTSON whether the U.S. manufacturer had cancelled KanRus's pending order for a weather radar device for Individual-4.

121.    On or about November 1, 2022, ROBERTSON emailed a document to Individual-4.  In handwritten responses, ROBERTSON wrote that he was still waiting to hear whether the open order was cancelled and asked Individual-4 whether, if the U.S. manufacturer cancelled the open order, Individual-4 could pursue "CZ, Your Friends??" The word "CZ" referred to the Czech Republic.

122.    On or about November 2, 2022, Individual-4 sent a response writing, "Regarding CZ - For me it will be a big morale impact [to] start it all again from beginning.  So, CZ I keep on [*sic] case if no other chances."   Later that day, ROBERTSON emailed his handwritten response via a document, "Understood.  I am working on possible solutions."

123.    On or about November 9, 2022, ROBERTSON emailed a document to Individual-4 stating that the U.S. manufacturer had cancelled all open orders, including Individual-4's order.  ROBERTSON also wrote that he had expressed his anger to the

U.S. manufacturer, but that he had "already found" two European dealers of the U.S. manufacturer that would sell avionics equipment to him.

124.   On or about November 11, 2022, ROBERTSON emailed a document to Individual-4.  In handwritten responses, ROBERTSON wrote that he was working on acquiring the weather radar device and an electronic flight instrument that Individual-4 had requested.

125.   On or about November 16, 2022, ROBERTSON emailed a document to Individual-4.  In response to Individual-4's updates on possible sources for the weather radar device and electronic flight instrument, ROBERTSON handwrote his comments on the proposed quotes, including a quote from someone in "CZ."

126.   On or about November 21, 2022, ROBERTSON emailed a document to Individual-4 responding, in handwritten responses, to Individual-4's statement that the partner in "CZ" was a "good trusted and verified partner" in Europe.

127.   On or about November 29, 2022, ROBERTSON emailed a document to Individual-4 that attached an invoice from a Czech dealer of the U.S. manufacturer, which had previously cancelled KanRus's dealer status.  The invoice was for the same weather radar device and electronic flight instrument that ROBERTSON and Individual-4 had been trying to acquire.  In handwritten responses, ROBERTSON asked Individual-4 whether ROBERTSON should pay the invoice from the Czech dealer on behalf of Individual-4.

128.    On or about December 2, 2022, Buyanovsky sent an international wire from KanRus's U.S. bank account to the Czech dealer's bank account in the Czech

28

Republic for Individual-4's order of the weather radar device and electronic flight instrument.

129.   On or about December 13, 2022, ROBERTSON emailed a document to Individual-4 that contained his handwritten responses to Individual-4's request that ROBERTSON tell the Czech dealer that the end user for the weather radar device and electronic flight instrument was a company in Kazakhstan.

130.   On or about March 1, 2023, ROBERTSON emailed a document to Individual-4 that contained his handwritten responses to Individual-4's questions about the status of the shipment, including a note that the "Cargo arrived" in Kansas, that it would be "a few weeks before shipping" to Russia, and that ROBERTSON would "prep for shipping."

*March 2023 Attempted FSB Export to Russian Company-1 via Armenia*

131.   On or about January 19, 2022, Individual-1 emailed Buyanovsky to ask for a price quote for a large shipment of eight VIAVI IFR-6000 transponder test kits, eight Comant CI-205 antennas, eight Comant CI-292 antennas, and eight Aero AT-1675 antennas.

132.   On or about January 20, 2022, Individual-1 emailed himself two documents concerning this order: a request for quote referencing a contract between the FSB and an aircraft manufacturing and repair company in Russia and a draft invoice between the Russian aircraft manufacturing and repair company and Russian Company-1, of which Individual-1 was the chief executive officer.  The documents were for the procurement of

29

a variety of aircraft equipment for the FSB, specifically eight IFR-6000 transponder test kits, eight CI-205 antennas, eight CI-292 antennas, and eight AT-1675 antennas.

133.    On or about January 20, 2022, Buyanovsky emailed Individual-1 and asked what suggestions he had for listing an end user in case his end user was not very "green" since the order was large.  Later that day, Individual-1 asked whether the Russian National Air Ambulance Service or Russian Emergency Situations Ministry would be an acceptable end user.  Buyanovsky responded that the U.S. supplier would not quote prices without an end user.

134.    On or about January 20, 2022, Buyanovsky emailed Individual-1 a quote for the eight IFR-6000 transponder test kits, eight CI-205 antennas, eight CI-292 antennas, and eight AT-1675 antennas.

135.    On or about February 2, 2022, Buyanovsky emailed Individual-1 an invoice for the eight IFR-6000 transponder test kits, eight CI-205 antennas, eight CI-292 antennas, and eight AT-1675 antennas.  The invoice listed Russian Company-1's address in Moscow, Russia as the billing and shipping address.

136.    On or about June 23, 2022, Individual-1 sent Buyanovsky an encrypted message asking for an update on the IFR transponder test kit order.  In a subsequent encrypted conversation, Buyanovsky and Individual-1 discussed possible transshipment points in Armenia and Georgia and whether providing a false end user located in Ukraine would work.

137.    On or about August 9, 2022, Buyanovsky and Individual-1 began using an encrypted email service, in addition to the encrypted messaging application, to

30

communicate.  Specifically, on or about August 9, 2022, Buyanovsky, using his encrypted email account, sent Individual-1 an email, at Individual-1's encrypted email account, testing the new method of secure communication.

138.    On or about August 17, 2022, Individual-1, using an encrypted email account, emailed Buyanovsky, at his encrypted email account, to state that the Kazakhs might contact Buyanovsky about pending orders.  On or about September 5, 2022, Individual-1 sent another encrypted email to Buyanovsky telling him that the Kazakhs would be contacting him about the IFR-6000 order.  Later that same day, Buyanovsky responded that the Kazakhs had contacted him.

139.    On or about September 13, 2022, Buyanovsky, using his KanRus email account, sent an email to a purported customer in Kazakhstan attaching an invoice for IFR transponder test kits.

140.    On or about November 1, 2022, Buyanovsky, using his encrypted email account, sent Individual-1 an email, at Individual-1's encrypted email account, asking where to ship the IFR transponder test kits.  Individual-1 responded that, as before, they would use the same Armenian transshipment scheme.

141.    On or about December 9, 2022, Buyanovsky purchased the eight IFR -6000 transponder test kits from a U.S. company and provided a false end user to the U.S. company that claimed that the end user was a company in Ukraine.

142.    On or about December 15, 2022, KanRus provided an invoice to Armenian Company-1 for eight IFR-6000 transponder test kits, listing Armenian Company-1 as the billing and shipping party.  Also on or about December 15, 2022, Buyanovsky, using his

31

encrypted email account, sent Individual-1 an email, at Individual-1's encrypted email account, with the subject line, "Armenia."  In the email, Buyanovsky updated Individual-1 on the status of the shipment.

143.    On or about December 21, 2022, Armenian Company-1 made a partial payment from an Armenian bank account to KanRus's bank account for this export. Later that day, using his encrypted email account, Buyanovsky sent Individual-1's encrypted email account a message confirming that he had received the wire from Armenian Company-1.

144.    On or about December 26, 2022, Individual-1 sent Buyanovsky an encrypted message stating that he should receive the remainder of the payment for this export in the next day.

145.    On or about December 27, 2022, Armenian Company-1 sent the remaining payment from an Armenian bank account to KanRus's bank account for this export. Later that day, Buyanovsky emailed ROBERTSON and told him to process this order.

146.    On or about January 17, 2023, Individual-1 sent Buyanovsky an encrypted message asking for an update on the shipment of IFR-6000 transponder test kits.

147.    On or about February 13, 2023, Individual-1 sent Buyanovsky a series of encrypted messages asking for another update on the IFR-6000 transponder test kits.  In response, Buyanovsky told Individual-1 that some of the transponder test kits had arrived and that they would be sent to the Armenians.

148.    On or about February 20, 2023, Buyanovsky emailed ROBERTSON and told him to prepare the export of IFR-6000 transponder test kits.  Later that day,

32

ROBERTSON replied that he would start work on the shipment to be sent later that week.

149.    On or about February 21, 2023, Buyanovsky sent Individual-1 a series of encrypted messages stating that the shipment was being prepared for export.

150.    On or about February 27, 2023, ROBERTSON emailed a shipper to ask for the eight IFR-6000 transponder test kits to be shipped to Armenian Company-1 in Armenia.

151.    On or about February 28, 2023, ROBERTSON caused the shipper to file a false and misleading EEI that listed the ultimate consignee as Armenian Company-1 and the ultimate destination as Armenia when, in fact, the avionics shipment was destined for Russian Company-1 and the FSB in Russia.  The IFR-6000 transponder test kits were on the CCL, classified by BIS under ECCN 7B994, and required a license from the Commerce Department to be exported or reexported to Russia.

152.    On or about March 1, 2023, Buyanovsky sent an encrypted message to Individual-1 stating that the U.S. Government had informed him that the package of the eight IFR-6000 transponder test kits was being inspected by the U.S. Government and that Buyanovsky had told an individual connected to Armenian Company-1 to prepare a false contract and a false end-user certificate.

153.    On or about March 2, 2023, Buyanovsky, using his encrypted email account, emailed Individual-1, at Individual-1's encrypted email account, a copy of the purported end-user certificate for Armenian Company-1 and instructed Individual-1 on how to complete the form.  Also on or about March 2, 2023, an email account associated

33

with Russian Company-1 emailed Armenian Company-1 a draft purported contract between KanRus and Armenian Company-1, which was backdated to December 2022, for the detained shipment of IFR-6000 transponder test kits and told Armenian Company-1 to confirm that the bank details were accurate.  Later that day, Armenian Company-1 emailed the email account associated with Russian Company-1 a partially executed copy of the backdated contract.

154.    On or about March 3, 2023, the same Russian company emailed Armenian Company-1 a partially completed copy of the end-user certificate.

155.    At no time did either ROBERTSON or Buyanovsky obtain the required license from the Commerce Department to export or reexport the IFR-6000 transponder test kits to Russia.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-7

**UNLAWFUL EXPORT OF U.S.-ORIGIN CONTROLLED GOODS TO RUSSIA**
**[50 U.S.C. § 4819]**

156.    The factual allegations in paragraphs 1 to 155 are hereby realleged and incorporated as if set forth in this paragraph.

157.    On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**DOUGLAS EDWARD ROBERTSON,**
**and**
**OLEG CHISTYAKOV,**
**a.k.a. OLEGS ČISTJAKOVS,**

34

knowingly and willfully exported and attempted to export and caused to be exported from the United States to Russia the items identified for each count, without first having obtained the required authorization and license from the Commerce Department:

| Count | Defendant | Approximate Date of Export | Exported Items |
|---|---|---|---|
| 2 | **ROBERTSON** | May 20, 2022 | Seven (7) KI-203 installation kits |
| 3 | **ROBERTSON** | June 16, 2022 | Eight (8) KT-74 transponders |
| 4 | **ROBERTSON** | July 18, 2022 | Eight (8) KA-61 antennas |
| 5 | **ROBERTSON CHISTYAKOV** | October 11, 2022 | Two (2) KN-62A distance-measuring equipment unit installation kits; two (2) KT-76C transponders; and two (2) KT-76C installation kits |
| 6 | **ROBERTSON CHISTYAKOV** | December 14, 2022 | KN-62A distance-measuring equipment unit |
| 7 | **ROBERTSON** | February 28, 2023 | Eight (8) IFR-6000 transponder test kits |

each in violation of Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Section 764.2; and Title 18, United States Code, Section 2.

## COUNTS 8-13

### SUBMITTING FALSE OR MISLEADING EXPORT INFORMATION
**[13 U.S.C. § 305]**

158.    The factual allegations in paragraphs 1 to 155 are hereby realleged and incorporated as if set forth in this paragraph.

159.    On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendant,

35

**DOUGLAS EDWARD ROBERTSON,**

knowingly and willfully failed to file and submitted false and misleading information

through the Electronic Export Information and the Automated Export System, and caused

the same, in connection with the exported items identified in each count:

| Count | Approximate Date of Export | Exported Items |
|---|---|---|
| 8 | February 4, 2021 | TRC-899 TCAS computer component |
| 9 | February 26, 2021 | TPU-67A TCAS computer processor; ART-2100 radar sensor |
| 10 | April 1, 2021 | TPU-67B TCAS computer processor; MST-67A transponder; two (2) IVA-81D TCAS speed indicators; PS-578 transponder; and ANT-67A antenna |
| 11 | October 11, 2022 | Two (2) KN-62A distance-measuring equipment unit installation kits; two (2) KT-76C transponders; and two (2) KT-76C installation kits |
| 12 | December 14, 2022 | KN-62A distance-measuring equipment unit |
| 13 | February 28, 2023 | Eight (8) IFR-6000 transponder test kits |

each in violation of Title 13, United States Code, Section 305; Title 15, Code of Federal

Regulations, Section 30.71; and Title 18, United States Code, Section 2.

## <u>COUNTS 14-22</u>

### SMUGGLING GOODS FROM THE UNITED STATES
### [18 U.S.C. § 554]

160.    The factual allegations in paragraphs 1 to 155 are hereby realleged and

incorporated as if set forth in this paragraph.

161.    On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**DOUGLAS EDWARD ROBERTSON,**
**and**
**OLEG CHISTYAKOV,**
**a.k.a. OLEGS ČISTJAKOVS,**

fraudulently and knowingly exported and sent and attempted to export and send from the United States the merchandise, articles, and objects identified in each count, contrary to the laws and regulations of the United States, to wit, Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Section 764.2; Title 13, United States Code, Section 305; and Title 15, Code of Federal Regulations, Section 30.71, and fraudulently and knowingly received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for export contrary to such laws and regulations of the United States:

| Count | Defendant | Approximate Date of Export | Exported Items |
|---|---|---|---|
| 14 | **ROBERTSON** | February 4, 2021 | TRC-899 TCAS computer component |
| 15 | **ROBERTSON CHISTYAKOV** | February 26, 2021 | TPU-67A TCAS computer processor; ART-2100 radar sensor |
| 16 | **ROBERTSON CHISTYAKOV** | April 1, 2021 | TPU-67B TCAS computer processor; MST-67A transponder; two (2) IVA-81D TCAS speed indicators; PS-578 transponder; and ANT-67A antenna |

| 17 | **ROBERTSON** | May 20, 2022 | Seven (7) KI-203 installation kits |
| 18 | **ROBERTSON** | June 16, 2022 | Eight (8) KT-74 transponders |
| 19 | **ROBERTSON** | July 18, 2022 | Eight (8) KA-61 antennas |
| 20 | **ROBERTSON CHISTYAKOV** | October 11, 2022 | Two (2) KN-62A distance-measuring equipment unit installation kits; two (2) KT-76C transponders; and two (2) KT-76C installation kits |
| 21 | **ROBERTSON CHISTYAKOV** | December 14, 2022 | KN-62A distance-measuring equipment unit |
| 22 | **ROBERTSON** | February 28, 2023 | Eight (8) IFR-6000 transponder test kits |

each in violation of Title 18, United States Code, Sections 554 and 2.

## COUNT 23

**CONSPIRACY TO COMMIT INTERNATIONAL MONEY LAUNDERING**
**[18 U.S.C. § 1956(h)]**

162.   The factual allegations in paragraphs 1 to 155 are hereby realleged and incorporated as if set forth in this paragraph.

163.   Between in or about February 2021 and continuing through in or about February 2023, in the District of Kansas and elsewhere, the defendants,

**DOUGLAS EDWARD ROBERTSON,**
**and**
**OLEG CHISTYAKOV,**
**a.k.a. OLEGS ČISTJAKOVS,**

did knowingly and willfully combine, conspire, confederate, and agree with each other, Cyril Buyanovsky, and with others known and unknown to the Grand Jury, including individuals associated with Russian Company-1, Russian Company-2, RosAero, and

38

Russian Company-4, to transport, transmit, and transfer and attempt to transport, transmit, and transfer a monetary instrument and funds to a place in the United States from and through a place outside the United States, and from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, smuggling goods from the United States in violation of Title 18, United States Code, Section 554, all in violation of Title 18, United States Code, Sections 1956(a)(2) and 1956(h).

## COUNTS 24-26

### LAUNDERING OF MONETARY INSTRUMENTS
### [18 U.S.C. § 1956(a)(2)]

164.    The factual allegations in paragraphs 1 to 155 are hereby realleged and incorporated as if set forth in this paragraph.

165.    On or about the dates listed for each count, in the District of Kansas and elsewhere, the defendants,

**DOUGLAS EDWARD ROBERTSON,**
**and**
**OLEG CHISTYAKOV,**
**a.k.a. OLEGS ČISTJAKOVS,**

willfully and knowingly transported and transferred, and attempted to transport and transfer, a monetary instrument and funds to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, smuggling goods from the United States in violation of Title 18, United States Code, Section 554:

39

| Count | Defendant | Description of Transfer |
|-------|-----------|------------------------|
| 24 | **ROBERTSON CHISTYAKOV** | September 2, 2022 wire from Kazakhstan to the United States in the amount of $8,338 |
| 25 | **ROBERTSON CHISTYAKOV** | November 16, 2022 wire from Kyrgyzstan to the United States in the amount of $7,400 |
| 26 | **ROBERTSON** | December 27, 2022 wire from Armenia to the United States in the amount of $140,000 |

each in violation of Title 18, United States Code, Sections 1956(a)(2) and 2.

## FORFEITURE NOTICE

166.    The allegations contained in paragraphs 1 to 165 and Counts 1-26 of this Second Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 50, United States Code, Section 4819, Title 13, United States Code, Section 305, Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code Section 982(a)(1), and Title 28, United States Code, Section 2461.

167.    Upon conviction of one or more of the offenses set forth in Counts 1-7 of this Second Superseding Indictment, the defendants,

**DOUGLAS EDWARD ROBERTSON** (Cts. 1-7),
**and**
**OLEG CHISTYAKOV** (Cts. 1, 5-6),
**a.k.a. OLEGS ČISTJAKOVS,**

shall forfeit to the United States, pursuant to Title 50, United States Code, Section 4819, any property: used or intended to be used in any manner to commit or facilitate the offenses; constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violations; or constituting an item or technology that

40

is exported or intended to be exported in violation of the offenses.  The property to be forfeited includes, but is not limited to, the following:

      A.  A forfeiture money judgment against each defendant in an amount equal to the amount of gross proceeds obtained or derived by that defendant from the commission of Counts 1-7;

      B.  Avionics equipment and accessories contained in cardboard box recovered from KanRus's New Century hangar;

      C.  Pallet of avionics equipment and accessories associated with attempted export ITN:X20230228312933; and

      D.  All items listed in the Preliminary Order of Forfeiture entered herein on February 15, 2024, at doc. 72.

168.    Upon conviction of one or more of the offenses set forth in Counts 1 and 8-13 of this Second Superseding Indictment, the defendant,

**DOUGLAS EDWARD ROBERTSON**,

shall forfeit to the United States of America, pursuant to Title 13, United States Code, Section 305, any interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the offenses; any interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the offenses; and any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the offenses.  The property to be forfeited includes, but is not limited to, the following:

      A.    A forfeiture money judgment against the defendant in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1 and 8-13.

41

169.    Upon conviction of one or more of the offenses set forth in Counts 1 and 14-22 of this Second Superseding Indictment, the defendants,

**DOUGLAS EDWARD ROBERTSON** (Cts. 1, 14-22),
**and**
**OLEG CHISTYAKOV** (Cts. 1, 15-16, 20-21),
**a.k.a. OLEGS ČISTJAKOVS,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following:

   A.    A forfeiture money judgment against each defendant in an amount equal to the amount of gross proceeds obtained or derived by that defendant from the commission of Counts 1 and 14-22.

170.    Upon conviction of the offenses set forth in Counts 23-26 of this Second Superseding Indictment, the defendants,

**DOUGLAS EDWARD ROBERTSON** (Cts. 23-26),
**and**
**OLEG CHISTYAKOV** (Cts. 23-25),
**a.k.a. OLEGS ČISTJAKOVS,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property.  The property to be forfeited includes, but is not limited to, the following:

   A.    A forfeiture money judgment against each defendant equal to the value of the property involved in Counts 23-26.

42

171.    If any of the property described above, as a result of any act or omission of

the defendants:

     A.    cannot be located upon the exercise of due diligence;

     B.    has been transferred or sold to, or deposited with, a third party;

     C.    has been placed beyond the jurisdiction of the court;

     D.    has been substantially diminished in value; or

     E.    has been commingled with other property which cannot be divided
       without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant

to Title 21, United States Code, Section 853(p).

A TRUE BILL.

March 27, 2024                  s/Foreperson
DATE                             FOREPERSON OF THE GRAND JURY

KATE E. BRUBACHER
UNITED STATES ATTORNEY

By: */s/ Ryan J. Huschka*
RYAN J. HUSCHKA
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: ryan.huschka@usdoj.gov
Ks. S. Ct. No. 23840

By: */s/ Scott C. Rask*
SCOTT C. RASK
Assistant United States Attorney

District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: scott.rask@usdoj.gov
Ks. S. Ct. No. 15643

By: */s/ Adam P. Barry*
ADAM P. BARRY
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Ph: (202) 233-0788
Fax: (202) 532-4251
Email: adam.barry@usdoj.gov
Cal. Bar No. 294449

IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## PENALTIES

### Count 1, Conspiracy

- Punishable by a term of imprisonment of not more than five.  18 U.S.C. § 371.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 2-7, Export Goods to Russia

- Punishable by a term of imprisonment of not more than twenty years.  50 U.S.C. § 4819.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $1,000,000.  50 U.S.C. § 4819.

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 8-13, False Export Information

- Punishable by a term of imprisonment of not more than five years.  13 U.S.C. § 305 and 15 C.F.R. § 30.71(a).

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $10,000 per violation.  13 U.S.C. § 305(a), (f); 18 U.S.C. § 3571(e).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 14-22, Smuggling

- Punishable by a term of imprisonment of not more than ten years.  18 U.S.C. § 554.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Count 23, Conspiracy to Commit International Money Laundering

- Punishable by a term of imprisonment of not more than twenty years.  18 U.S.C. § 1956(a)(2).

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $500,000 or twice the value of the property involved in the transaction, whichever is greater.  18 U.S.C. § 1956(a)(2).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 24-26, International Money Laundering

- Punishable by a term of imprisonment of not more than twenty years.  18 U.S.C. § 1956(a)(2).

46

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $500,000 or twice the value of the property involved in the transaction, whichever is greater.  18 U.S.C. § 1956(a)(2).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.